IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**STATE OF CALIFORNIA,**

Plaintiff,

**v.**

**UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT; UNITED STATES DEPARTMENT OF JUSTICE; DOUG BURGUM, in his official capacity as Secretary of the Interior; MATTHEW GIACONA, in his official capacity as Acting Director of the Bureau of Ocean Energy Management; TODD BLANCHE, in his official capacity as Attorney General; STANLEY WOODWARD, in his official capacity as Associate Attorney General;**

Defendants,

*and*

**GOLDEN STATE WIND, LLC**,

Defendant (Count III) and Interested Party (other Counts).

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Date:
Time:
Dept:
Judge:
Trial Date:
Action Filed:

## INTRODUCTION

1. For almost a decade, the State of California has worked closely with the U.S. Department of the Interior's Bureau of Ocean Energy Management (BOEM), under both the first Trump administration and the Biden administration, to develop offshore wind energy projects in federal waters off California's coast. There, powerful, steady ocean winds provide a valuable renewable energy resource with potential to help power the State's homes and economy. But, upon assuming office last year, President Trump announced a whole-of-government effort to throttle the offshore wind industry—despite his "energy dominance" agenda.

2. Having spent most of 2025 issuing arbitrary "stop-work" orders to offshore wind energy projects, which courts uniformly struck down as unlawful, the Trump administration has turned to a new tactic to circumvent the courts altogether: buying out developers' offshore wind energy leases through collusive settlements. On April 27, 2026, the Department of the Interior announced an agreement to buy out and then cancel an offshore wind lease for a project off the California coast held by Golden State Wind. That latest attack on offshore wind misappropriates taxpayer dollars to force the abandonment of a project that would have created California jobs, revitalized California ports, and provided California with clean energy.

3. The development of offshore wind energy in the United States is governed by the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331 *et seq*., and its implementing regulations, *see* Code of Federal Regulations, Title 30, Part 585. In 2005, Congress extended OCSLA's offshore oil-and-gas leasing program to support offshore wind energy development as well. OCSLA's provisions and regulations set forth a comprehensive permitting and consultation framework to ensure that all lease activities are safe and any potential hazards are mitigated. That framework makes California an essential partner in the development of offshore wind projects that use its ports and waters and send energy into its power grid.

4. In December 2022, the Department of the Interior announced the sale at auction of five wind leases off the shore of California.[1] The winning bidders included Central California

---

[1] U.S. Department of the Interior, *Biden-Harris Administration Announces Winners of California Offshore Wind Energy Auction* (Dec. 7, 2022),

(continued…)

Offshore Wind, LLC, now Golden State Wind LLC, which purchased offshore wind lease OCS-P 0564. Lease area OCS-P 0564 is an 80,418-acre lease an area approximately 22 miles off California's central coast, northwest of Morro Bay, with the capacity to produce approximately 1.5 to 2 gigawatts of offshore wind energy.

5. Golden State Wind's $150,300,000 winning bid included $30,060,000 in "bid credits," or commitments by the company to expend certain funds on workforce training, domestic supply chain development, and community benefits. Amended and Restated Renewable Energy Lease OCS-P 0564 (GSW Lease), at 1, C-22–C-30. A true and accurate copy of the GSW Lease is attached hereto as **Exhibit A**. Those $30 million in bid credits were anticipated to support significant economic activity, harbor development and coastal works around California's northern and central coast ports.

6. In expectation of the wind projects being developed off its coast, including the Golden State Wind project, the State of California has invested over $100 million to support the development of offshore wind, including creating a statewide offshore wind strategic plan and developing its ports and transmission facilities to support offshore wind. California expected that these investments would yield economic growth, new jobs, significant progress toward its clean energy and climate policy goals, and a powerful clean energy source to diversify its grid.

7. On April 27, 2026, however, the Department of the Interior announced that it had reached an agreement with Golden State Wind to terminate Lease OCS-P 0564.[2] This ostensible "settlement" represented that BOEM intended to issue a stop-work order and purported to settle the claims that Golden State Wind would have brought in response to such an order. That order would have "suspend[ed] construction and operations of this project indefinitely due to national security issues, similar to" suspension orders BOEM had issued to other projects—and which had been successfully enjoined and vacated by the courts. Settlement Agreement Between the United

---

https://www.doi.gov/pressreleases/biden-harris-administration-announces-winners-california-offshore-wind-energy-auction (last visited Aug. 21, 2026).

[2] U.S. Department of the Interior, *Interior Announces Two Historic Agreements to Promote Affordable, Reliable Energy Production in the United States* (Apr. 27, 2026), https://www.doi.gov/pressreleases/interior-announces-two-historic-agreements-promote-affordable-reliable-energy (last visited Aug. 21, 2026) (GSW Press Release).

States and Golden State Wind LLC (Settlement Agreement), at 2.[3] A true and accurate copy of the Settlement Agreement is attached hereto as **Exhibit B**.

8. Under the terms of that buyout agreement, Golden State Wind will cause its corporate affiliates to invest up to $120,240,000—the value of its winning bid for Lease OCS-P 0564, minus the value of the bid credits—in fossil fuel energy projects. *Id.* at 4. According to the Department of the Interior, these projects involve oil and gas infrastructure along the Gulf Coast, i.e., not in California, and not even on the outer continental shelf. The United States will then pay the same amount to Golden State Wind from the Judgment Fund, a permanent appropriation for the payment of judgments and settlements against the United States. *Id.* at 5. Golden State Wind also reportedly agreed not to pursue any other offshore wind projects in the United States.

9. The buyout and cancellation of Lease OCS-P 0564 is unlawful and must be set aside pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), because it is arbitrary and capricious, illegal, and in excess of statutory jurisdiction. Among many unreasoned aspects of its decision making, BOEM has proceeded with no regard for California's significant reliance interests in Lease OCS-P 0564, including millions of dollars invested with the support of Congress, the Department of the Interior, and California voters to develop the State's offshore wind industry. The lease cancellation also violates numerous guardrails in OCSLA and its regulations, the Coastal Zone Management Act (CZMA), and the National Environmental Policy Act (NEPA) that protect California's stake in Lease OCS-P 0564.

10. Independent of the lease cancellation's illegality, the Settlement Agreement presents multiple abuses of federal appropriations process. First, by providing for payment from the Judgment Fund, the Settlement Agreement violates both the Judgment Fund Act, 31 U.S.C. § 1304, and the Antideficiency Act, 31 U.S.C. § 1341. In particular, although the Judgment Fund may be used to satisfy a "compromise settlement[] . . . for defense of imminent litigation," 28 U.S.C. § 2414; *see* 31 U.S.C. § 1304(a)(3)(A), that condition cannot be satisfied by backroom deals over phantom controversies. The litigation described in the Settlement Agreement was

[3] Even though the Settlement Agreement is not a compromise settlement agreement reached by adverse parties, Federal Defendants refer to it as such, so California will use the term "Settlement Agreement" to avoid confusion.

never "imminent" but rather couched within nested conditionals: the agreement purports to resolve the suit that Golden State *would have* filed *if* BOEM had issued a suspension order described only in abstract. The Judgment Fund cannot be used to resolve a sequence of hypotheticals.

11. The benefit that the buyout agreement *actually* confers on the federal government is not the dismissal of any genuine litigation claims but the funding of the Trump administration's preferred fossil-fuel energy projects, paid for by virtue of public funds never appropriated for that purpose. But the Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const., Art. I, § 8, cl. 1; U.S. Const., art. I, § 9, cl. 7. The Executive Branch has no authority to give offshore wind leaseholders a "dollar-for-dollar reimbursement"[4] of their lease fees: once deposited into the U.S. Treasury, the lease fees became part of a general pool of monies expendable only by Congress's appropriation. Nor may the Executive Branch direct that $120 million refund to fossil-fuel projects that have nothing to do with federal waters, much less the offshore wind leasing program that Congress funded BOEM to administer. Because Congress never appropriated such sum for this purpose, Defendants' expenditure is contrary to the Spending and Appropriations Clauses. By arrogating spending authority constitutionally delegated to Congress, Defendants have also acted *ultra vires* and violated the constitutional separation of powers.

12. California seeks an order declaring the Settlement Agreement and lease cancellation unconstitutional and unlawful under the APA, OCSLA, and other relevant statutes; vacating and setting aside the Settlement Agreement and lease cancellation; compelling compliance with OCSLA; and enjoining Defendants from taking any further action with respect to the Settlement Agreement or lease cancellation and enjoining Defendants from entering into similar agreements with any other California offshore wind lessees.

## JURISDICTION AND VENUE

13. This action arises under the Constitution, the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*, the Administrative Procedure Act, 5 U.S.C. §§ 553, 701–706, and other

[4] GSW Press Release, *supra* note 2.

applicable laws of the United States. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346(a)(2) and 43 U.S.C. § 1349(b)(1).

14. An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

15. The Court has personal jurisdiction over all Defendants given their purposefully directed conduct of activities in this district, including around the Port of Humboldt.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) and 43 U.S.C. § 1349(b)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff California "resides" in this district, 28 U.S.C. § 1391(e)(1)(C), at least one defendant "resides" in this district, *id.* § 1391(e)(1)(A), and defendants "may be found" in this district, 43 U.S.C. § 1349(b)(1). *See Superior Oil Co. v. Andrus*, 656 F.2d 33, 35 (3d Cir. 1981).

**PARTIES**

17. Plaintiff State of California, a sovereign State in the United States of America, brings this action by and through Attorney General Rob Bonta and the California Energy Commission (CEC).

18. Attorney General Rob Bonta is the chief law enforcement officer of California.

19. CEC is a primary energy policy and planning agency of the State of California. Its responsibilities include assessing, analyzing, and forecasting California's energy industry; formulating energy policy recommendations; co-administering California's Renewable Energy Portfolio; investing in renewable energy generation and deployment in California; tracking progress on California's renewable energy transition; and planning for future electric system infrastructure.

20. Defendant United States Department of the Interior is a cabinet agency within the Executive Branch of the United States government.

21. Defendant Bureau of Ocean Energy Management is a bureau within the Department of the Interior responsible for the offshore wind energy leasing program.

22. Doug Burgum is the Secretary of the Department of the Interior. He is sued in his official capacity.

23. Matthew Giacona is the Acting Director of BOEM. He is sued in his official capacity.

24. Defendant United States Department of Justice is a cabinet agency within the Executive Branch of the United States government responsible for settling claims against the United States.

25. Todd Blanche is the Attorney General of the United States and head of the U.S. Department of Justice. He is sued in his official capacity.

26. Stanley Woodward is an Associate Attorney General in the United States Department of Justice. He is sued in his official capacity.

27. Collectively, the above defendants are the "Federal Defendants." Defendants the Department of the Interior, BOEM, Secretary Burgum, and Acting Director Giacona are the "Interior Defendants."

28. Golden State Wind, LLC is a Delaware limited liability corporation. Golden State Wind is joined as a defendant solely as to Count III, and is otherwise joined as an interested party whose legal rights and obligations may be affected by the relief requested in this litigation.

## ALLEGATIONS

### I. LEGAL BACKGROUND

#### A. The Constitutional Spending Framework

29. "The United States Constitution exclusively grants the power of the purse to Congress." *City & Cnty. of San Francisco*, 897 F.3d at 1231. It does so through two key constitutional provisions: the Spending Clause and the Appropriations Clause. *Id.*

30. The Spending Clause provides Congress authority "[t]o lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare to the United States." U.S. Const. art. I, § 8, cl. 1. Congress has "broad power under the Spending Clause . . . to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).

31. The Appropriations Clause provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause has a "fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427-28 (1990).

32. The Antideficiency Act is a federal statute prohibiting executive officers from obligating or spending funds which Congress has not appropriated. 31 U.S.C. § 1341. The Antideficiency Act gives "criminal bite" to the Appropriations Clause by "penaliz[ing] unauthorized government expenditures with hefty fines and imprisonment." *Ctr. for Investigative Reporting v. U.S. Dep't of Justice*, 14 F.4th 916, 943 (2021) (Bumatay, J., dissenting).

33. Another "core tenet of appropriations law is enshrined in 31 U.S.C. § 1301(a), the 'Purpose Statute.'" *U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (*Dep't of Navy*). The Purpose Statute provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).

34. Under the Purpose Statute, "in order for appropriated funds to be legally available for an expenditure, 'the purpose of the obligation or expenditure must be authorized.'" *Dep't of Navy*, 665 F.3d at 1348 (quoting 1 GAO, Principles of Federal Appropriations Law at 4-6.) "[A]ll uses of appropriated funds must be affirmatively approved by Congress; the mere absence of a prohibition is not sufficient." *Id.*

35. Finally, the Miscellaneous Receipts Act, 31 U.S.C. § 3302, ensures the Executive Branch cannot circumvent the constitutional appropriations process with public monies received on behalf of the federal government. *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Defense*, 87 F.3d 1356, 1362(D.C. Cir. 1996); *see* Kate Stith, *Congress' Power of the Purse*, 97 YALE L.J. 1343, 1364 (1988) ("[T]he Miscellaneous Receipts statute and the Anti-Deficiency Act addressed a chronic problem Congress faced throughout the 19th century: ensuring that executive agencies did not obligate the public fisc except in the amounts appropriated by Congress.").

36. The Miscellaneous Receipt Act requires that any "official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim" and that "[a] person having custody or possession of public money … shall deposit the money without delay in the Treasury." 31 U.S.C. § 3302(b), (c). Once so deposited, the funds become part of a general pool of federal funds that can only be expended according to an appropriation by Congress.

**B. The Judgment Fund**

37. The Judgment Fund is "a permanent, indefinite appropriation which is available to pay many judicially and administratively ordered monetary awards against the United States." 31 C.F.R. § 256.1. In addition to judgments, "amounts owed under compromise agreements negotiated by the U.S. Department of Justice in settlements of claims arising under actual or imminent litigation are normally paid from the Judgment Fund." *Id.*

38. The statutory source of the Judgment Fund is 31 U.S.C. § 1304, which "appropriate[s]" "[n]ecessary amounts" for the United States to pay "final judgments, awards, compromise settlements, and interests and costs" when (1) "payment is not otherwise provided for"; (2) "payment is certified by the Secretary of the Treasury"; and (3) "the judgment, award, or settlement is payable" under certain statutes, including 28 U.S.C. § 2414.

39. 28 U.S.C. § 2414 provides that certain settlements of claims may be paid from the Judgment Fund. Specifically, it states that "compromise settlements of claims" made by the U.S. Attorney General "for defense of imminent litigation or suits against the United States . . . shall be settled and paid in a manner similar to judgments in like causes."

40. The U.S. Government Accountability Office (GAO) has explained that litigation "is not 'imminent' for purposes of 28 U.S.C. § 2414 merely because a claimant will sue if the agency does not pay." GAO Office of the General Counsel, *Principles of Federal Appropriations Law* (2d ed. Nov. 1994) (Red Book), Vol. III, GAO/OGC-94-33 at 14-19–14-20 (citing 58 Comp. Gen. 667 (1979)), https://www.gao.gov/assets/ogc-94-33.pdf (last visited Aug. 21, 2026). "There must be a legitimate dispute over either liability or amount. Absent such a dispute or impasse, there is nothing to refer to the Attorney General." *Id.*

### C. The Outer Continental Shelf Lands Act

41. Energy development of the Outer Continental Shelf is governed by OCSLA, originally adopted in 1953. *See* 43 U.S.C. § 1331 *et seq.*

42. It is the "policy of the United States" that the Outer Continental Shelf is "a vital national resource reserve held by the Federal Government for the public, which should be made available to expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3).

43. Under OCSLA, the States "are entitled to an opportunity to participate, to the extent consistent with the national interest, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf." 43 U.S.C. § 1332(4)(C); *see also* Pub. L. No. 95-372, §§ 102(5)–(6), 202, 92 Stat. 631–32, 634–635 (1978) (adding this language to OCSLA and declaring Congress's intent to "assure that States … have timely access to information regarding activities on the Outer Continental Shelf, and opportunity to review and comment on decisions relating to such activities … [and] are provided an opportunity to participate in policy and planning decisions relating to management of the resources of the Outer Continental Shelf"). It is the policy of the United States that "rights and responsibilities of all States . . . to preserve and protect their marine, human, and coastal environments through such means as regulation of land, air, and water uses, of safety, and of related development and activity should be considered and recognized." 43 U.S.C. § 1332(5).

44. Moreover, "[a]ll rentals, royalties, and other sums paid to the Secretary … under any lease on the outer Continental Shelf … shall be deposited in the Treasury of the United States and credited to miscellaneous receipts." 43 U.S.C. § 1338.

45. In 2005, Congress passed the Energy Policy Act. Energy Policy Act of 2005, Pub. L. 109-58, 119 Stat. 594 (EPAct). The Act extended OCSLA's leasing program to renewable energy resources by adding section 1337(p), which authorizes the U.S. Department of the Interior to "grant a lease, easement, or right-of-way" on the outer continental shelf for activities that

"produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas" on a competitive basis. EPAct § 388, 119 Stat. 744–45.

46. Section 1337(p) also requires the Secretary to ensure "that any activity under this subsection is carried out in a manner that provides for" twelve enumerated priorities, including "national security," "prevention of waste," and "a fair return to the United States for any lease, easement, or right-of-way under this subsection." 43 U.S.C. § 1337(p)(4); *see also* 30 C.F.R. § 585.102.

47. Section 1334 requires the Secretary of the Interior to promulgate regulations "with respect to cancellation of any lease or permit." 43 U.S.C. § 1334(a)(2). These regulations must provide that "such cancellation may occur at any time, if the Secretary determines, after a hearing, that—

> (i) continued activity pursuant to such lease or permit would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral (in areas leased or not leased), to the national security or defense, or to the marine, coastal, or human environment;
>
> (ii) the threat or harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time; and
>
> (iii) the advantages of such cancellation outweigh the advantages of continuing such lease or permit force."

43 U.S.C. § 1334(a)(2); *accord* 30 C.F.R. § 550.184 (OCSLA compensation regulation).

48. Section 1334 also states exactly the amount of compensation a lessee may receive in the event of a lease cancellation. It provides that the lessee will receive the *lesser* of:

> (i) *the fair value of the canceled rights as of the date of cancellation*, taking account of both anticipated revenues from the lease and anticipated costs, including costs of compliance with all applicable regulations and operating orders, liability for cleanup costs or damages, or both, in the case of an oilspill, and all other costs reasonably anticipated on the lease, or
>
> (ii) *the excess, if any, over the lessee's revenues*, from the lease (plus interest thereon from the date of receipt to the date of reimbursement) *of all consideration paid for the lease and all direct expenditures made by the lessee* after the date of issuance of such lease and in connection with exploration or

> development, or both, pursuant to the lease (plus interest on such consideration and such expenditures from date of payment to date of reimbursement).

43 U.S.C. § 1334(a)(2)(C) (emphasis added).

49. Section 1341 of OCSLA contains two sections authorizing the suspension of leases on national security grounds. First, all leases under OCSLA are construed "to contain a provision whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President … , to suspend operations under any lease," as well as a provision "for the payment of just compensation to the lessee whose operations are thus suspended." 43 U.S.C. § 1341(c).

50. Second, the United States retains the right "to designate … as areas restricted from exploration and operation that part of the outer Continental Shelf needed for national defense." 43 U.S.C. § 1341(d). "[I]f operations or production under any lease theretofore issued . . . shall be suspended" during such designation, "the term of such lease shall be extended by adding thereto any such suspension period, and the United States shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States." *Id.*

### D. The Coastal Zone Management Act

51. The CZMA declares that it is the national policy to "encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone." 16 U.S.C. § 1452.

52. Accordingly, the CZMA requires that "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone . . . be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State [coastal zone] management programs." *Id.* § 1456(1)(A).

53. In order to ensure this consistency between Federal actions and State coastal management programs, the CZMA provides that each Federal agency carrying out an activity "affect[ing] any land or water use or natural resource of the coastal zone" "shall provide a consistency determination"—i.e., a determination that a particular federal action is or is not "consistent" with the State's coastal management program—"to the relevant State agency . . . at the earliest practicable time, but in no case later than 90 days before final approval of the Federal activity unless both the Federal agency and the State agency agree to a different schedule." *Id.* § 1456(1)(A), (C).

54. For instance, in April 2022, BOEM issued a consistency determination finding that the wind leases in the Morro Bay Wind Energy Area were "consistent to the maximum extent practicable with the California Coastal Management Program … and the California Coastal Act of 1976."[5]

55. Where a Federal agency concludes that a given activity will not affect any coastal use or resources, but the activity (i) is the same or similar as activities for which consistency determinations have been provided in the past; (ii) was identified by a State agency as likely to require a consistency determination; or (iii) is an activity for which the Federal agency has undertaken a consistency assessment, the Federal agency must still provide the State agency with a "negative determination." 15 C.F.R. § 930.35. The negative determination must contain, among other things, "the basis for the Federal agency's determination that the activity will not affect any coastal use or resource." *Id.* § 930.35(b)

**E. The National Environmental Policy Act**

56. NEPA requires federal agencies to prepare an environmental impact statement for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Pursuant to that requirement, an agency must take a

[5] Consistency Determination for Leasing Wind Energy Areas Offshore Morro Bay, California at 1 (Apr. 15, 2022), https://documents.coastal.ca.gov/assets/upcoming-projects/offshore-wind/BOEMs-Consistency-Determination.pdf (last visited Aug. 21, 2026).

hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives.

57. To determine whether a major federal action will have a significant effect on "the quality of the human environment," agencies may prepare an environmental assessment. *Id.* § 4336(b)(2). If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a finding of no significant impact. *Id.* If the environmental assessment reveals that there may be significant effects, an environmental impact statement is required. Either level of review requires public participation opportunities and consideration of alternatives to the proposed action. *Id.* § 4332(C)(iii), (F), (H).

## II. Factual Background

### A. The Federal Government's Longstanding Bipartisan Support for Offshore Wind Energy

58. Until January 2025, the federal government developed, supported, and advanced offshore wind projects.

59. In 2005, after passage by strong bipartisan majorities in the House and Senate, President George W. Bush signed the Energy Policy Act, which opened the outer continental shelf to offshore wind leasing. EPAct § 388, 119 Stat. 744-45. The Act gave States important consultation rights in the leasing process for offshore wind energy projects and a 27% stake in lease revenues from such projects, while providing industry important regulatory certainty in how these projects would be approved.

60. Indeed, when opponents of an East Coast offshore wind project attempted to add an additional layer of review for that project to a 2006 Coast Guard bill, the Bush administration warned that "singling out wind generation in this manner could have a chilling impact on the continued investment and growth of this promising renewable energy resource."[6]

---

[6] NGI Staff Reports, "Bush Administration Opposes Measure Threatening to Cape Wind," *Natural Gas Intelligence* (May 8, 2006), https://naturalgasintel.com/news/bush-administration-opposes-measure-threatening-to-cape-wind/ (last visited Aug. 21, 2026).

61. In February 2011, the U.S. Departments of Energy and the Interior released the first offshore wind strategic guide.[7] The Obama administration later oversaw the development of the first offshore wind farm off the coast of Long Island.

62. The first Trump administration auctioned offshore wind leases[8] and conducted environmental reviews of offshore wind projects.[9] In particular, under Secretary Zinke, BOEM conducted agency proceedings and took public comment calling for the nomination of appropriate offshore wind lease areas off the California coast, identifying both the Humboldt and Morro Bay areas as candidates for the offshore wind leasing program. 83 Fed. Reg. 53,096 (Oct. 19, 2018). The CEC and California Public Utilities Commission submitted joint comments emphasizing the importance of offshore wind energy to the State's climate and energy policies and the robust two-year collaboration between BOEM and California agencies on offshore wind development. *See* BOEM-2018-0045-0084 (Jan. 28, 2019).

63. The Biden administration set a goal of 30 gigawatts of offshore wind by 2030, which would power 10 million homes.[10] Like the first Trump administration, it conducted auctions for offshore wind leases and advanced those projects through environmental review.[11] On May 25, 2021, the U.S. Departments of Defense and the Interior and the State of California announced an agreement to advance areas for offshore wind off California's northern and central

[7] U.S. Department of Energy, *A National Offshore Wind Strategy: Creating an Offshore Wind Energy Industry in the United States* (February 2011), https://www.energy.gov/sites/default/files/2013/12/f5/national_offshore_wind_strategy.pdf (last visited Aug. 21, 2026).

[8] *See, e.g.*, U.S. Department of the Interior, *Bidding Bonanza! Trump Administration Smashes Record for Offshore Wind Auction with $405 Million in Winning Bids* (Dec. 14, 2018, edited Sept. 29, 2021), https://www.doi.gov/pressreleases/bidding-bonanza-trump-administration-smashes-record-offshore-wind-auction-405-million (last visited Aug. 21, 2026).

[9] *See, e.g.*, Notice of Availability of a Draft Environmental Impact Statement for Vineyard Wind LLC's Proposed Wind Energy Facility Offshore Massachusetts, 83 Fed. Reg. 63,184 (Dec. 7, 2018).

[10] U.S. Department of Energy, *Energy Secretary Granholm Announces Ambitious New 30GW Offshore Wind Deployment Target by 2030* (Mar. 29, 2021), https://www.energy.gov/articles/energy-secretary-granholm-announces-ambitious-new-30gw-offshore-wind-deployment-target (last visited Aug. 21, 2026).

[11] *See, e.g.*, U.S. Department of the Interior, *Biden-Harris Administration Marks Major Milestones for Offshore Wind, Approves Tenth Project* (Sept. 5, 2024), https://www.doi.gov/pressreleases/biden-harris-administration-marks-major-milestones-offshore-wind-approves-tenth (last visited Aug. 21, 2026).

costs.[12] The Department of Defense stated it was "committed to working across the U.S. government to find solutions that support renewable energy in a manner compatible with essential military operations." *Id.* BOEM conducted the relevant lease auctions for the Humboldt and Morro Bay Wind Energy Areas (WEAs) in 2022, discussed *infra*.

64. In 2020, Congress passed and President Trump signed the Energy Act of 2020 as part of the Consolidated Appropriations Act, 2021. Pub. L. No. 116-260, Div. Z, 134 Stat. 1182, 2418. Section 3003 of the Energy Act of 2020 created the Wind Energy Technology Program in the U.S. Department of Energy, to "conduct research, development, demonstration, and commercialization of wind energy technologies," including, specifically, offshore wind-specific technologies such as floating offshore wind platforms. 134 Stat. at 2498–501, *codified at* 42 U.S.C. § 16237(b)(1)(A), (2)(B)(iv). The act appropriated $125 million for fiscal years 2021–2025 to carry out the Wind Energy Technology Program. 134 Stat. at 2504.

65. In 2021, Congress passed and President Biden signed the Infrastructure Investment & Jobs Act (IIJA), also known as the Bipartisan Infrastructure Law. Pub. L. No. 117-58, 135 Stat. 429. Section 41007 of the IIJA, titled "Renewable Energy Projects," appropriated an additional $60 million for fiscal years 2022–2025 to carry out the Wind Energy Technology Program. 135 Stat. at 1129.

66. In 2022, Congress passed and President Biden signed the Inflation Reduction Act (IRA). The IRA enacted the advanced manufacturing production tax credit, 26 U.S.C. § 45X, to subsidize the U.S. manufacture of clean energy components, including offshore wind energy turbines, foundations, and service vessels. Pub. L. No. 117-169, § 13052(a), 136 Stat. 1818, 1971–81; *see* 26 U.S.C. § 45X(c)(4) (defining "wind energy components"). When, in 2025, Congress repealed or sunsetted most of the IRA tax credits in the "One Big Beautiful Bill" Act, it preserved the 45X credit for wind energy components through the end of 2027. Pub. L. No. 119-21, § 70514, 139 Stat. 72, 273–75.

[12] *Biden-Harris Administration Advances Offshore Wind in the Pacific* (May 25, 2021), https://www.doi.gov/pressreleases/biden-harris-administration-advances-offshore-wind-pacific (last visited Aug. 21, 2026).

67. This year, Congress appropriated $20 million to BOEM's renewable energy activities, including offshore wind energy development, despite BOEM requesting $0 for its renewable energy activities.[13]

**B. Offshore Wind Planning and Approval Process**

68. The process of developing an offshore wind project involves extensive planning, review, and consultation.

69. Prior to issuing a lease, BOEM must "coordinate and consult with relevant Federal agencies, … any affected federally recognized Indian Tribes, the Native Hawaiian Community or Alaska Native Corporations, as appropriate, the Governor of any affected State, and the executive of any affected local government." 30 C.F.R. § 585.203.

70. For instance, the BOEM California Intergovernmental Renewable Energy Task Force, consisting of dozens of federal and state agencies and federal, state, tribal, and local government representatives, held five meetings between 2016 and 2022—before any California offshore wind leases had even been auctioned off—as well as conducting public information meetings, webinars, and other outreach efforts.[14]

71. In awarding leases through a competitive lease award process, BOEM must take the following steps: (1) publishing a Call for Information "to determine qualifications of prospective bidders and interest in preliminarily identified [outer continental shelf] lease areas"; (2) identifying lease areas in consultation with appropriate federal, state, tribal, and local agencies; (3) publishing a Proposed Sale Notice in the Federal Register and taking public comment; (4) publishing a Final Sale Notice in the Federal Register; (5) holding an auction; and (6) awarding leases. 30 C.F.R. § 585.210. Federal regulations further explain BOEM's obligations during each of these steps. *Id.* §§ 585.211-14, 585.220-26.

[13] Congressional Research Service, *Offshore Energy Agency Appropriations, FY2026* (Mar. 11, 2026), https://www.congress.gov/crs_external_products/IF/PDF/IF13149/IF13149.3.pdf (last visited Aug. 21, 2026).

[14] Bureau of Ocean Energy Management, *California Activities*, https://www.boem.gov/renewable-energy/state-activities/california-activities (last visited Aug. 21, 2026); *see, e.g.*, BOEM California Intergovernmental Renewable Energy Task Force Membership Roster (May 2021), https://www.boem.gov/California-Intergovernmental-Renewable-Energy-Task-Force-Roster (last visited Aug. 21, 2026).

72. Before a lessee conducts activities on its least or grant, it must submit and receive BOEM approval of its Site Assessment Plan (SAP), Construction and Operations Plan (COP), and/or General Activities Plan (GAP). Each of these plans is subject to extensive requirements and a thorough and lengthy approvals process. 30 C.F.R. § 585.600; *see id.* §§ 585.605-07, 585.610-18 (requirements for SAP); *id.* §§ 585.620-22, 585.626-28, 585.631-35 (requirements for COP); *id.* §§ 585.640-42, 585.645-48, 585.650-57 (requirements for GAP).

73. In addition, a lessee must obtain a wide variety of federal, state, and local permits, approvals, and consultations. These include an Analysis of Potential Military and Naval Impacts from the Department of Defense, under which the US DoD Military Aviation and Installation Assurance Siting Clearinghouse provides an analysis of potential project impacts to military operations (e.g., military testing and training operations and military radar capabilities) and the U.S. Naval Seafloor Cable Protection Office provides recommendations to avoid the Navy's submarine assets, including cable systems.

74. BOEM also conducts extensive studies of the offshore environment to support its decisionmaking about outer continental shelf energy programs.[15]

### C. Golden State Wind Wins and Begins Development Of Lease No. OCS-P 0564

75. On May 31, 2022, BOEM published Pacific Wind Lease Sale 1 (PACW-1) for Commercial Leasing for Wind Power on the Outer Continental Shelf in California—Proposed Sale Notice, identifying the areas available for leasing as the Humboldt WEA, which was subdivided into two lease areas, and the Morro Bay WEA, which was subdivided into three lease areas. 87 Fed. Reg. 32,443 (May 31, 2022).

76. On October 5, 2022, BOEM announced that it had completed its environmental review of offshore wind leasing impacts in the Morro Bay WEA, issuing a finding of no

---

[15] BOEM, *Environmental Studies – Pacific*, https://www.boem.gov/environment/environmental-studies-pacific (last visited Aug. 21, 2026); *see also* BOEM, *Selected BOEM-Funded Research Informing Renewable Energy Offshore California* (August 2023), https://www.boem.gov/renewable-energy/selected-boem-research-information-ca (last visited Aug. 21, 2026).

significant impacts. The Environmental Assessment reflected consultation with the Department of Defense.[16]

77. Following a comment period, BOEM published the PACW-1—Final Sale Notice on October 21, 2022, providing information about the areas available for commercial wind leasing on the Outer Continental Shelf off the shore of California, the auction process through which leases would be awarded, and details about the leases themselves. 87 Fed. Reg. 64,093 (Oct. 21, 2022).

78. On December 7, 2022, following the wind energy auction, the Department of the Interior announced that Central California Offshore Wind, LLC, was the winning bidder for Lease OCS-P 0564. The winning bid was $150,300,000, of which $30,060,000 were bid credits. GSW Lease at 1. BOEM also awarded four other leases in the Humboldt and Morro Bay WEAs in the same auction.

79. The lease was executed effective June 1, 2023, and amended after Central California Offshore Wind LLC changed its name to Golden State Wind LLC.

80. The lease provides that "[a]ny cancellations are subject to the limitations and protections contained in subsections 5(a)(2)(B) and (C) of" OCSLA. GSW Lease at 3–4 (citing 43 U.S.C. § 1334(a)(2)(B) and (C)).

81. It further provides that "[a]ny cancellation or suspension" ordered by BOEM "that is predicated on a threat of serious irreparable, or immediate harm or damage, or an immediate threat of serious or irreparable harm or damage, requires a finding by [BOEM] of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities." *Id.* at 3.

82. Under the terms of the lease, Golden State Wind agrees that "the United States reserves and has the right to temporarily suspend operations and/or require evacuation on this lease in the interest of national security." *Id.* at C-9.

---

[16] Final Environmental Assessment, Commercial Wind Lease and Grant Issuance and Site Assessment Activities on the Pacific Outer Continental Shelf, Morro Bay Wind Energy Area, California at 4, https://www.boem.gov/renewable-energy/state-activities/2022-morrobay-finalea (last visited Aug. 21, 2026).

83. Of the $30,060,000 in bid credits, Golden State Wind must spend $24,048,000 for workforce training and/or domestic supply chain development. GSW Lease at C-22–C-27.

84. Golden State Wind must spend the remaining $6,012,000 in bid credits for one or more lease area-use community benefit agreements. GSW Lease at C-27–C-30.

85. According to Golden State Wind's Conceptual Bid Credit Strategies submitted to BOEM, its proposed strategies for spending the bid credits included investments in infrastructure upgrades at Port of Humboldt and Port Hueneme, match funds for CEC offshore wind programs, and other expenditures that would have improved California land or wetland and boosted taxable economic activity in California.

86. After the execution of the lease, Golden State Wind began meeting the lease requirements. According to Golden State Wind, it has spent $70,000,000 developing Lease OCS-P 0564 as of the date of the agreement. Settlement Agreement at 2.

87. On June 14, 2024, Golden State Wind announced that it had "received all required permits and approvals to commence geophysical survey activities" in the lease area and would begin those surveys on July 2, 2024.

88. On November 14, 2024, pursuant to NEPA regulations, BOEM released a draft programmatic environmental impact statement (PEIS) identifying programmatic mitigation measures to lessen the environmental impacts of the Humboldt Bay and Morro Bay wind leases. 89 Fed. Reg. 90,051 (Nov. 14, 2024); BOEM, California Offshore Wind Draft Programmatic Environmental Impact Statement (Nov. 2024).[17] The draft PEIS included analysis of potential national security impacts. *See, e.g.*, California Offshore Wind Draft PEIS at 3.4.8-3.

### D. The Trump Administration Begins Its Illegal (but Unsuccessful) Attacks on Offshore Wind

89. On January 20, 2025, President Trump issued a memorandum to temporarily withdraw all areas on the outer continental shelf from offshore wind leasing. 90 Fed. Reg. 8363 (Jan. 29, 2025) (Wind Memo). The Wind Memo further halted the issuance of "new or renewed

[17] https://www.boem.gov/renewable-energy/state-activities/20241021capeisvoli508c (last visited Aug. 21, 2026).

approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices." *Id.* In response to the memorandum, several federal agencies immediately stopped issuing wind energy authorizations. *See New York v. Trump*, 811 F.Supp.3d 215, 227 (D. Mass. 2025).

90. Also on January 20, 2025, President Trump issued an executive order titled *Declaring a National Energy Emergency*, which declared the need for "a reliable, diversified, and affordable supply of energy" and encouraged "energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf." 90 Fed. Reg. 8433 (Jan. 29, 2025). The executive order defined "energy" to exclude wind energy. *Id.* at 8436.

91. Also on the same day, President Trump issued an executive order titled *Unleashing American Energy*, which similarly stated that it is in "the national interest to unleash America's affordable and reliable energy and natural resources." 90 Fed. Reg. 8353 (Jan. 29, 2025). This executive order similarly was written not to apply to wind energy. *Id.*

92. President Trump has continued to issue executive orders claiming that the United States must unlock more of its energy capacity to meet the national need, even while attempting to block, cancel, and stymie offshore wind projects. For instance, the executive order *Strengthening the Reliability and Security of the United States Electric Grid* states that the "United States' ability to remain at the forefront of technological innovation depends on a reliable supply of energy from *all* available electric generation sources and the integrity of our Nation's electric grid." 90 Fed. Reg. 15,521 (Apr. 14, 2025) (emphasis added).

93. On April 16, 2025, BOEM issued a letter to an East Coast offshore wind project, Empire Offshore Wind LLC, "to halt all ongoing activities related to the Empire Wind Project on the outer continental shelf." Letter from Walter D. Cruickshank, Acting Director, BOEM, to Matthew Brotmann, Secretary, Empire Offshore Wind (Apr. 16, 2025). The letter described this action as "an outgrowth of the review that the Department is engaged in related to offshore wind projects." *Id.* BOEM later lifted the halt. Letter from Walter D. Cruickshank, Acting Director, BOEM, to Matthew Brotmann, Secretary, Empire Offshore Wind (May 19, 2025).

94. On July 7, 2025, President Trump issued the executive order *Ending Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy Sources.* 90 Fed. Reg. 30,821 (July 10, 2025). The executive order directed the termination of tax credits for wind and solar facilities, which it described as "compromis[ing] our electric grid," "denigrat[ing] the beauty of our Nation's natural landscape," and "making the United States dependent on supply chains controlled by foreign adversaries." *Id.*

95. On August 22, 2025, BOEM issued a letter to Revolution Wind, LLC "to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf." Letter from Matthew N. Giacona, Acting Director, to Rob Keiser, Head of Asset Management, Orsted North America Inc. (Aug. 22, 2025). The letter stated that BOEM sought "to address concerns related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas." *Id.*

96. Revolution Wind, LLC filed suit, and on September 22, the order was stayed and preliminarily enjoined. Order Granting Preliminary Injunction, *Revolution Wind, LLC v. Burgum*, No. 25-cv-2999 (D.D.C. Sept. 22, 2025), ECF No. 36.

97. On December 8, 2025, the suspension of wind authorizations ordered by the Wind Memo was vacated on the basis that it was arbitrary and capricious and contrary to law. Memorandum and Order, *New York v. Trump*, 811 F. Supp. 3d at 244–45.

98. On December 22, 2025, the Department of the Interior announced that it was pausing five large-scale offshore wind projects, effective immediately, purportedly "due to national security risks identified by the Department of War."[18]

99. The affected wind companies challenged the pauses, and in January and February 2026, federal courts entered preliminary injunctions against all five pauses. Minute Order and Entry, *Empire Leaseholder LLC v. Burgum*, No. 1:26-cv-00004-CJN (D.D.C. Jan. 15, 2026);

---

[18] U.S. Department of the Interior, *The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases* (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases (last visited Aug. 21, 2026).

Minute Order and Entry, *Sunrise Wind LLC v. Burgum*, No. 1:26-cv-00028-RCL (D.D.C. Feb. 2, 2026); Minute Entry for Preliminary Injunction Hearing, *Revolution Wind, LLC v. Burgum*, 1:25-cv-02999-RCL (D.D.C. Jan. 12, 2026); Minute Entry, *Virginia Electric & Power Co. v. United States Dep't of the Interior*, No. 2:25-cv-00830-JKW-LRL (E.D. Va. Jan. 16, 2026); Clerk's Notes for Motion Hearing, *Virginia Wind 1 LLC v. U.S. Dep't of the Interior*, No. 1:26-cv-10156-BEM (D. Mass. Jan. 27, 2026). These courts uniformly found that the Interior Department's claim of national security risks did not support the suspension orders.

100. In April 2026, a court preliminarily enjoined additional federal actions related to wind, including an onerous review procedure for all Interior Department actions related to wind and solar facilities; an announcement by the United States Fish and Wildlife Service that solar and wind projects could not use the Information for Planning and Consulting website; an order from Secretary Burgum restricting the agency's ability to approve energy projects based on a project's "capacity density," which disproportionately affected wind projects; a memo requiring the Army Corps of Engineers to prioritize permit processing for projects with higher capacity densities; and an Interior Department Solicitor's Opinion with the practical effect of making wind energy approvals essentially unobtainable. *RENEW Northeast v. U.S. Dep't of Interior*, No. 25-cv-13961-DJC, 2026 WL 1078282, at *5, *15 (D. Mass. Apr. 21, 2026). The court found that the plaintiffs were likely to prevail on their claims that each of these actions was arbitrary and capricious or contrary to law. *Id.* at *22–28.

101. As courts have repeatedly found, the Trump administration's actions against offshore wind are not consistent with the law, but they *are* consistent with statements made by the President and administration officials about wind power. During a conference with the President of the European Commission in July 2025, President Trump expressed that he will "not allow a windmill to be built in the United States" and that windmills are "killing the beauty of our scenery, our valleys, our beautiful plains."[19] In March 2026, President Trump expressed that

[19] Edward Peters, *Trump renews attacks on wind power with bizarre tirade* (July 28, 2025), TGS 4C, https://www.tgs4c.com/news/trump-renews-attacks-on-wind-power-with-bizarre-tirade-nid31554.html (last visited Aug. 21, 2026).

windmills are "very bad environmentally; they kill the birds; they're unsightly; they make a lot of noise," and stated that his goal was "to not let any windmill be built" because "[t]hey're losers."[20]

102. In September 2025, Secretary Burgum stated that there "is not a future for offshore wind because it is too expensive and not reliable enough."[21] In October 2025, Secretary Burgum stated that "[i]ntermittent, highly expensive wind is bad for everybody," describing offshore wind as "something that makes no sense."[22]

103. None of the Trump administration's categorical objections to offshore wind energy projects—which are themselves unsupported and arbitrary—are consistent with Congress's long-held policy of encouraging U.S. offshore wind development, or have anything to do with national security risks.

104. Despite the unlawful character of the administration's attacks, and despite the developers' victories in court vacating stop-work orders, the administration's pervasive, persistent hostility toward offshore wind energy projects has dramatically impacted the market value of these leases. For example, offshore wind developers Equinor and Ørsted reported impairments of $955 million and $170 million taken on offshore wind projects attributed in part or whole to the 2025 suspension orders.[23]

105. On information and belief, the regulatory uncertainty caused by the Trump administration's 2025 attacks on offshore wind energy has significantly reduced the market value of even those leases not specifically targeted by suspension orders or similar interference. That

[20] Tamara Keith, *Trump takes aim at windmills despite increasing energy costs* (Mar. 24, 2026), NPR, https://www.npr.org/2026/03/24/nx-s1-5684158/trump-takes-aim-at-windmills-despite-increasing-energy-costs (last visited Aug. 21, 2026).

[21] Spencer Kimball, *Offshore wind has no future in the U.S. under Trump administration, Interior Secretary says* (Sept. 11, 2025), CNBC, https://www.cnbc.com/2025/09/11/offshore-wind-renewables-energy-trump-burgum.html (last visited Aug. 21, 2026).

[22] Carlos Anchondo & Ian M. Stevenson, *Burgum declares offshore wind 'bad for everybody'* (Oct. 21, 2025), EnergyWire, https://subscriber.politicopro.com/article/eenews/2025/10/21/burgum-declares-offshore-wind-bad-for-everybody-00615940 (last visited Aug. 21, 2026).

[23] Gwladys Fouche & Nerijus Adomaitis, "Blaming Trump, Equinor books a $955 million US offshore wind writedown," *Reuters* (July 23, 2025), https://www.reuters.com/sustainability/climate-energy/blaming-trump-equinor-books-955-million-us-offshore-wind-writedown-2025-07-23/; Ørsted Annual Report 2025, at (Feb. 6, 2026), https://cdn.orsted.com/-/media/annual-2025/annual-report-2025.pdf?rev=34ff0f324dc1429bac1bc84382c30a9d (last visited Aug. 21, 2026) (attributing 1.1 billion DKK in writedowns to the Revolution Wind stop-work orders specifically).

more generalized reduction of market value owes to, *inter alia*, delays and increased construction costs caused by changing, uncertain federal permitting practices; federal agencies' inextricable authority over offshore projects in federal waters; and an increased perceived risk that the Trump administration may succeed in postponing or preventing revenues from these projects altogether.

106. In February 2025, Ocean Winds, which holds 50% equity in Golden State Wind, informed investors it had reduced the valuation of its North American portfolio of offshore wind energy projects (the Golden State Wind, Bluepoint Wind, and SouthCoast Wind leases off of the California, New York, and Massachusetts coasts, respectively) by $260 million.[24] On information and belief, all three projects suffered impairments in value from the Trump administration's 2025 actions to freeze, delay, or otherwise interfere with offshore wind approvals.

### E. Switching Tactics, The Trump Administration Attempts to Buy Out Wind Developers

107. On March 23, 2026, the Trump administration signaled a novel tactic to kill offshore wind projects: the lease buyout. The Department of the Interior announced that it had entered into an agreement with Attentive Energy, LLC, a subsidiary of French energy company TotalEnergies, to buy out and cancel an offshore wind energy lease off the New York coast. That agreement purported to settle Attentive's ostensible claims arising out of BOEM's threatened suspension of its wind energy lease due to "national security issues."[25]

108. The agreement between Attentive and the United States asserts that the Department of War had raised "classified national security concerns about development of this lease that were not known to BOEM at the time of lease issuance and that would have prevented the lease issuance if they had been considered." Settlement Agreement Between the United States and Attentive Energy, LLC, at 2.[26] If the offshore wind project had continued, BOEM "would

[24] Anastasia E. Lennon, "SouthCoast Wind's value declines due to Trump's opposition," *The New Bedford Light* (Feb. 27, 2025), https://newbedfordlight.org/southcoast-winds-value-declines-due-to-trumps-opposition/ (last visited Aug. 21, 2026).

[25] U.S. Department of the Interior, *Interior and TotalEnergies Agree to End Offshore Wind Projects, Lower Costs for American Families* (Mar. 23, 2026), https://www.doi.gov/pressreleases/interior-and-totalenergies-agree-end-offshore-wind-projects-lowering-costs-american (last visited Aug. 21, 2026).

[26] https://www.boem.gov/renewable-energy/state-activities/4-attentive-agreementpdf (last visited Aug. 21, 2026).

have issued to Attentive an order to suspend construction and operations of this project indefinitely due to national security issues, similar to" the suspension orders BOEM had issued to five offshore wind projects in December 22, 2025. *Id.* The Attentive agreement further provides that Attentive will invest approximately $795 million in oil, gas, or other "non-renewable based electricity" projects in the United States and the United States will pay the same amount to Attentive from the Judgment Fund. *Id.* at ¶¶ 1-2, 5. Attentive also agreed not to pursue any other offshore wind projects in the United States.

109. Twenty-five days after announcement of the Attentive agreement, the Office of the Secretary of the Interior issued a formal "Lease Cancellation Decision" by letter dated April 17, 2026.[27] The letter states that the Department of the Interior "determined that cancelling Lease OCS-A 0538 is in the public interest" "[a]s reflected in the [Attentive agreement]," that "[i]n accordance with the agreement, DOI is hereby cancelling and rescinding Lease No. OCS-A 0538," and "[p]ursuant to Section 5 of the agreement, DOI will, through the Department of Justice, request payment" from the Judgment Fund equal to $795,000,000. *Id.* at 1–2.

110. This "TotalEnergies model" of buyout operates with the cynical logic of an extortion racket: the Trump administration first abuses its authority to make the offshore wind energy leases worth significantly less than what the developer paid at auction; then, offering the original bid amount in exchange for lease cancellation works as the proverbial unrefusable offer given these companies' fiduciary responsibilities to their investors. Worse still, the administration coerces these companies into channeling the settlement funds toward the administration's own political goals, thereby extracting benefits it could not achieve through the lawful appropriations processes. The Trump administration further strong-arms these companies into agreeing to exit the U.S. offshore wind market indefinitely.

/ / /

/ / /

[27] https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Cancellation%20Letter%20%28OCS-A%200538%29%20Attentive%20Energy%20LLC.pdf?VersionId=VYk.oTr3kAaKU9emuaAAN2CQqpOOJafe (last visited Aug. 21, 2026).

111. On April 27, 2026, the Department of the Interior announced the second and third lease buyouts following the above TotalEnergies model: with Golden State Wind, concerning its Morro Bay lease, and with Bluepoint Wind, concerning a lease off the New York Bight.

112. Like the Attentive agreement, the Golden State Wind buyout agreement provides that BOEM "would have issued to Golden State an order to suspend construction and operations of this project indefinitely due to national security issues, similar to the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." Settlement Agreement at 2. It purports to settle claims that Golden State Wind would have brought "for breach of contract and/or uncompensated takings under the Fifth Amendment of the United States Constitution." *Id.* Though the buyout was styled as a settlement agreement, the negotiations between Golden State Wind and the federal government do not resemble the settlement of an actual or imminent claim against the United States.

113. First, notwithstanding the Trump administration's broad attack against offshore wind energy, at no time prior to BOEM's announcement of the Golden State Wind buyout agreement did BOEM publicly disclose any intent to suspend the Golden State Wind project, much less initiate proceedings to suspend or cancel the lease or notify the Governor of California pursuant to the requirements of OCSLA. *See* 43 U.S.C. §§ 1334(a)(2), (h), and 1337(p)(7). In fact, the only written notification by BOEM to Golden State Wind communicating such intent to suspend construction, temporarily or permanently, or the grounds for such an action, appears in drafts of the buyout agreement itself.

114. Second, Golden State Wind never filed or came close to filing a complaint, administrative challenge, or similar legal action. Based on documents obtained in CEC's investigation of the Golden State Wind buyout, Golden State Wind communicated its interest in "potential resolution of our project" to the Department of the Interior in a January 9, 2026, email and expected Interior's "formal offer" thereafter. But the first time Golden State Wind articulated to the federal government in writing any breach of contract or takings theory—or any legal claim at all—was in a February 16, 2026 email. This "settlement offer first, claim after" sequence is not how the federal government resolves genuine legal controversies.

115. Nor did the drafting negotiations over the buyout agreement appear to involve the Department of Justice, as no Justice recipient appears on the month's worth of emails trading drafts and redlines of the agreement. Several terms of the agreement also violate the Department of Justice's policies on settling litigation. *See* Justice Manual § 1-17.000 (last updated Dec. 2024) (imposing strict nexus and public input requirements on settlements involving payments to non-governmental third parties); 89 Fed. Reg. 97,525 (Dec. 9, 2024) (same); *see* Atty. Gen. Bondi, Memorandum, *Reinstating the Prohibition on Improper Third-Party Settlements* (Feb. 5, 2025) ("Except in limited circumstances, … settlements should not be used to require payments to non-governmental, third-party organizations that were neither victims nor parties to the lawsuits.").

116. Under the terms of the buyout agreement, Golden State Wind will direct up to $120,240,000 to unspecified, third-party oil, gas, and other non-renewable energy projects off the Gulf Coast, and the United States will pay the same amount to Golden State Wind from the Judgment Fund. Settlement Agreement at 4-5. $120,240,000 represents Golden State's winning bid for Lease OCS-P 0564 minus the value of the bid credits. GSW Lease at 2. But because, on information and belief, Golden State Wind LLC exists only to develop the Morro Bay offshore wind energy project, the agreement requires Golden State Wind to direct the required fossil-energy investment through its corporate parents or their subsidiaries. Settlement Agreement at 3, 4.

117. According to the Department of the Interior press release, Golden State Wind has also agreed not to pursue any other offshore wind projects in the United States.

118. On information and belief, Golden State Wind would have developed the offshore wind energy project contemplated in the GSW Lease but for the buyout agreement and the Federal Defendants' unlawful efforts to thwart offshore wind energy.

119. The federal government is continuing to pursue this strategy with regard to other offshore leases. On June 17, 2026, the Department of the Interior announced that it had reached a similar agreement with Invenergy to terminate four offshore wind leases located in the New York

Bight, Central Coast of California, and Gulf of Maine.[28] On August 6, 2026, RWE announced a $1.22 billion buyout of its three offshore wind leases located in the Northern Coast of California, the Gulf Coast of Louisiana, and the New York Bight.[29] On information and belief, the Federal Defendants are following the same modus operandi with each of those agreements, contending a settlement agreement is appropriate to resolve legal claims even though there appears to be no evidence that BOEM took formal action to suspend or cancel leases nor any evidence that the companies initiated or even threatened legal action.

120. To date, the Federal Defendants have directed nearly $4 billion from the Judgment Fund toward cancelling twelve offshore wind energy projects, including three of the five federal leases that would serve California's power grid. On information and belief, none of the fossil fuel investments announced in these buyouts would generate energy for California.

## III. California Is Harmed by Defendants' Actions

### A. The Lease Buyout Deprives California of the Benefits of Its Investments

121. The buyout and cancellation of Golden State Wind's Lease OCS-P 0564 will harm California by depriving it of certain benefits of its extensive investments in offshore wind development and stranding existing investments that would have supported the Golden State Wind project.

122. In 2021, the California Legislature adopted Assembly Bill 525, Cal. Stats. 2021, c. 231 (AB 525), finding that offshore wind energy, if deployed at scale, can advance California's climate and energy goals, reduce costs both for the State and its electricity consumers, reduce transmission congestion, diversify the State's energy resources, attract investment, and promote community economic development and workforce development, among other economic, energy,

---

[28] U.S. Department of the Interior, *Interior Announces New Energy Agreement to Strengthen American Energy Security and Lower Costs* (June 17, 2026), https://www.doi.gov/pressreleases/interior-announces-new-energy-agreement-strengthen-american-energy-security-and-lower (last visited Aug. 21, 2026).

[29] Nichola Groom, "RWE, Trump administration reach $1.22 billion agreement to cancel offshore wind leases," *Reuters* (Aug. 6, 2026), https://www.reuters.com/legal/litigation/rwe-says-reached-122-bln-deal-cancel-us-offshore-wind-leases-invest-gas-2026-08-06/ (last visited Aug. 21, 2026).

and environmental benefits. *Id.* § 1(a)–(g). Accordingly, AB 525 required CEC to develop an offshore wind energy strategic plan.

123. In 2024, California voters passed Proposition 4, a climate bond that included $475 million for offshore wind development. In 2025, California allocated $225.7 million of this $475 million to upgrade port infrastructure for offshore wind development. Cal. Stats. 2025, c. 104, § 57 (SB 105).

124. So far, California, including through CEC, has invested over $100 million to support Lease OCS-P 0564 and the other offshore wind leases, including:

a. $42.75 million through the Waterfront Facilities Improvement Program to five port projects to support the staging, integration, operations, and/or maintenance of offshore wind turbines.

b. $10.5 million to the Humboldt Bay Harbor District to develop an offshore wind port facility to support staging, integration, operations, and maintenance of offshore wind turbines.

c. $41 million through the California Public Utilities Commission (CPUC) and CEC's Electric Program Investment Charge (EPIC) Program to technology providers and national laboratories to develop innovative anchoring systems, mooring lines, floating substation designs, and environmental monitoring tools.

d. $3 million for offshore wind monitoring and ecosystem protection research and development at the Ocean Protection Council.

e. $2 million to develop the AB 525 Offshore Wind Energy Strategic Plan and its technical sub-reports, the AB 3 Second Phase Port Readiness Study, and the Offshore Wind Supply Chain Study.

f. $1 million to plan for transmission studies regarding interconnection and grid hosting capacity for offshore wind.

g. $4 million in staff and administrative costs to support the development and implementation of its other offshore wind investments.

h. $1 million appropriated by the Legislature in 2022, and administered by the California Department of Transportation, to the County of San Luis Obispo for a regional port feasibility study.

125. These dollars are already at work in California. For instance, the $10.5 million grant is being spent to advance the Humboldt Bay Heavy Lift Multipurpose Marine Terminal Project through pre-construction design and permitting activities, including required environmental reviews. The Humboldt Marine Terminal project includes facilities for assembly, launching, and long-term maintenance of offshore wind turbines for both the Humboldt and Morro Bay wind farms.

126. Several EPIC grants fund research and development specific to the conditions in the California WEAs, such that the loss of some or all of the California offshore wind projects will partially or wholly eliminate the value of these investments. For example, a $500,000 award to California State Polytechnic University, Humboldt funded a study on the density of seabirds' flight heights that showed 92% flying below a certain height—a result enormously beneficial to the design of bird-safe floating wind turbines. But that result was specific to California seabirds in the California coastal regions studied. Similarly, a $3.4 million award for an innovative anchoring system funds technology development specific to the conditions within the California WEAs.

127. California expected these investments to yield long-term benefits for the State. California's Offshore Wind Energy Strategic plan estimated that 10 gigawatts of offshore wind development could create $45 billion in short-term economic benefits to the state. CEC, Assembly Bill 525 Offshore Wind Energy Strategic Plan (AB 525 Plan), Volume I: Overview Report, at 9–10. Another study found that developing the Humboldt and Morro Bay WEAs would generate 169,000 construction job years, around 5,750 annual and maintenance jobs, and over $15 billion in local wages by 2040.[30]

128. In addition to economic and workforce benefits, CEC's study indicated that offshore wind could boost tax revenues; improve grid reliability; and reduce required

[30] E2, *California's Offshore Wind Opportunity* (Feb. 27, 2023), https://tinyurl.com/3ps4zvx9 (last visited Aug. 21, 2026).

expenditures on environmental mitigation and public health by reducing greenhouse gas emissions. *See generally* AB 525 Plan, Volume II: Main Report.

129. Instead, since the Golden State Wind buyout was announced on April 27, 2026, the State's investments have been in jeopardy.

130. For instance, the loss of planned California offshore wind projects, including the Golden State Wind project, is causing significant delays for the Humboldt Marine Terminal project. These delays are expensive, driving up project costs and forcing the loss of key staff. Each month of delay also means the delay of the project's expected benefits, which include energy, economic, and workforce benefits to the entire region. The delay also creates a risk that the project's required review under the California Environmental Quality Act (CEQA) will no longer be sufficiently up-to-date and will need to be redone. Since the above $10.5 million grant from CEC funds that CEQA review, this outcome would mean the State's funds were essentially wasted. Further, the longer the project is delayed, the greater the risk the Project will run out of financing before it is completed, causing the expected benefits to be lost entirely.

131. The Golden State Wind lease buyout, and any future buyouts, will prevent California from realizing the value of its investments in offshore wind and will strand existing assets.

132. On information and belief, Golden State Wind would have developed the offshore wind energy project under the GSW Lease but for Federal Defendants' unlawful actions and will continue to do so if the lease buyout is unwound. At the very least, undoing the lease buyout will enable a willing developer to purchase and develop the lease if Golden State Wind is unwilling to continue and deter other California WEA developers from accepting similar buyouts. Thus, unwinding the illegal buyout and cancellation of the GSW Lease will at least partially remedy California's injuries.

/ / /

/ / /

/ / /

/ / /

### B. The Lease Buyout Deprives California of the Benefit of Golden State Wind's Bid Credits

133. The lease buyout also deprives California of the value of Golden State Wind's over $30,060,000 in bid credits, which would have supported workforce training, domestic supply chain development, and communities in California. GSW Lease at C-22–C-30.

134. Golden State Wind's proposed strategy for spending the bid credits included investments in State of California projects as well as expenditures that would have boosted taxable economic activity in California, such as investments in building out California ports.

135. The Morro Bay and Humboldt projects are all "floating" offshore wind projects. Unlike fixed-foundation turbines suitable for shallower waters, floating turbines are mounted to a floating platform anchored to the ocean floor. These massive floating towers—which can reach as high as 120 meters, or taller than a 30-story building—are constructed in harbors with specialized infrastructure and depth and then towed out to their WEAs.

136. CEC's recent $42.5 million in awards under the Waterfront Facility Improvement Program supports the refits and development of such infrastructure at the Ports of Long Beach and Port San Luis (on the central coast) and the Ports of Humboldt, Oakland, and Richmond (on the northern coast). Because turbine components are manufactured, integrated, and maintained at ports, then towed out to their final locations, any of these ports could have ended up supporting the turbines for the Golden State Wind project.

137. Golden State Wind's conceptual bid credit strategy contemplates directing much of the $30 million in bid credits to infrastructure investments at California ports on the central and northern coasts, including engineering studies, port access improvements, utility upgrades, and harbor dredging. These bid credits would have complemented similar efforts by CEC under the Waterfront Facilities Improvement Program and even provided match funds for that CEC program.

138. In addition, these harbor works would also have included mitigation, restoration, and resiliency projects in coastal wetlands and other adjacent lands that were likely to provide value to State-owned coastal lands and facilities.

139. The Golden State Wind bid credits would also have supported supply chain development and technological research specific to California's offshore wind industry. These bid credits would have complemented and even provided match funds for the CPUC and CEC's EPIC Program.

140. The lease buyout will prevent the realization of all direct or indirect benefits that would have accrued to California under the bid credits, and unwinding the lease buyout will at least partially remedy this injury.

### C. The Lease Buyout Impairs California's Options to Satisfy Its Clean Energy and Climate Policy Statutes

141. The lease buyout reduces the options available to California to satisfy its clean energy and climate policies, including statutory goals adopted by the people's representatives, thereby injuring its ability to implement its own laws and forcing the State to incur additional expenses to meet its renewable energy and emissions reduction targets.

142. California's history of statutes addressing climate change and renewable energy date back at least twenty years to 2006, when the Global Warming Solutions Act required California to reduce the state's greenhouse gas emissions to 1990 levels by 2020. Stats. 2006, c. 488 (AB 32). Having met those targets four years early, California in 2016 adopted a new target of 40 percent reduction from 1990 levels by 2030. Cal. Stats. 2016, c. 249 (SB 32).

143. In 2018, California passed SB 100, which requires 100% of the State's electricity retail sales come from renewable and zero-carbon resources by 2045. Cal. Stats. 2018, c. 312 (SB 100).

144. In 2022, the State passed AB 1279, which requires California to achieve net zero greenhouse gases no later than 2045 and to ensure that state anthropogenic greenhouse gas emissions are reduced to at least 85% below the 1990 levels by 2045. Cal. Stats. 2022, c. 337 (AB 1279).

145. Citing AB 525's vision of a developed offshore wind industry advancing progress on the State's climate and clean energy policies, California's June 2024 Offshore Wind Energy

Strategic Plan reflects California's planning goals of 25 gigawatts of offshore wind energy by 2045. AB 525 Plan, Vol. II at 95.

146. The Golden State Wind lease buyout, and any future buyouts, impair California's implementation of statutes like AB 1279 and SB 100 by reducing the clean energy resources able to satisfy these legislative targets, thereby injuring the State's ability to implement its own laws. California's future attempts to meet its obligations under these statutes will require the State to expend resources to identify, analyze, plan for, and incorporate new additional energy sources. Unwinding the lease buyout would at least partially remedy these injuries.

### D. The Lease Buyout Removes 1.5 to 2 Gigawatts of Clean Energy from California Energy Regulators' Long-Term Planning

147. The California Air Resources Board predicts that by 2045, electricity demand in California will increase 76% from 2022 levels.[31] In order to ensure this demand is met, California must expend resources to plan the State's energy supply, for example, through the integrated resource planning process.

148. Some energy sources must be identified or even procured long in advance of when they will be used to avoid higher costs or project development uncertainty. AB 1373 authorizes the CPUC to identify a central procurement agent for long-lead-time energy resources in order to create the opportunity for diverse, reliable, and cost-effective renewable energy. Stats. 2023, c. 367 (AB 1373). Under the CPUC's 2024 need determination, any solicitations for offshore wind energy resources would have to begin in 2027—i.e., next year—in order for any such resources to come online in the 2035–37 time frame.[32]

149. Offshore wind energy offers a valuable resource to diversify the grid, while maintaining reliability and affordability and meeting policy goals. *See* AB 525 Plan, Vol. II, at

---

[31] California Air Resources Board, *2022 Scoping Plan for Achieving Carbon Neutrality* (Nov. 16, 2022), at 202 https://ww2.arb.ca.gov/sites/default/files/2022-11/2022-sp.pdf (last visited Aug. 21, 2026).

[32] *See, e.g.*, CPUC, Fact Sheet: Decision Determining Need for Centralized Procurement of Long Lead-time Resources (R.20-05-003) (Aug. 22, 2024), https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/energy-division/documents/integrated-resource-plan-and-long-term-procurement-plan/ab1373/final_decision_-ab1373_factsheet_pdf.pdf (last visited Aug. 21, 2026).

94. Offshore wind energy is especially useful because it is highly complementary to solar energy, which makes up a significant portion of California's energy supply: offshore wind turbines can generate significant quantities of electricity when solar production is lower, such as later in the day and during the winter, mitigating the intermittency challenges of a solar-heavy grid. *See id*. at 99.

150. California regulators will have to revise and update their long-term resource planning to account for the loss of 1.5 to 2-gigawatts of clean energy from the Golden State Wind project, not to mention any other offshore wind projects that enter into similar lease buyouts with Defendants. Those revisions will require time and resources from the CEC, CPUC, and other state agencies. Unwinding the lease buyout would at least partially remedy these injuries.

### E. The Lease Buyout Impairs California's Access to Offshore Wind Energy as a Consumer

151. The lease buyout also deprives California of the ability to buy wind energy from the Golden State Wind project.

152. California and its instrumentalities are required to purchase energy like any other Californian consumer. For instance, in 2024–2025 the California State University system alone spent $139.5 million on electricity and $30.4 million on natural gas.[33]

153. The cancellation of Lease OCS-P 0564 will reduce the amount of wind energy that is available for California to buy for its buildings, facilities, and services.

154. By reducing the number of California offshore wind lessees, the Golden State Wind lease buyout, and any future buyouts, also reduce the supply of offshore wind, driving up the price for California to develop offshore wind in the future. Unwinding the lease buyout would at least partially remedy these injuries.

/ / /

/ / /

/ / /

[33] The California State University, CSU Energy Dashboard: Total Cost Summary, https://www.calstate.edu/csu-system/doing-business-with-the-csu/capital-planning-design-construction/operations-center/Pages/csu-energy-dashboard.aspx (last visited Aug. 21, 2026).

## CAUSES OF ACTION

### COUNT I: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### The Lease Cancellation Is Arbitrary and Capricious (Against Interior Defendants)

155. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

156. The U.S. Department of the Interior and BOEM are "agencies" as defined in 5 U.S.C. § 551. Plaintiff is a legal person suffering a legal wrong or adversely affected by Defendants' conduct under 5 U.S.C. § 702.

157. The Settlement Agreement reflects a final agency decision to cancel Lease OCS-P 0564 upon the fulfillment of certain conditions. *See* Settlement Agreement at 5 ("Within five business days of the Effective Date of this Agreement, DOI will cancel Lease No. OCS-P 0564 and inform [the Office of Natural Resources Revenue] that Lease No. OCS-P 0564 has been cancelled."). Because Defendants have committed themselves to cancelling the lease if and when those conditions are met, the Settlement Agreement represents the consummation of the agency's decision making process. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). And because that decision affects the rights and obligations of Golden State Wind and Interior Defendants, the status of Lease OCS-P 0564, and the participatory rights of interested parties like California in the lease cancellation, it is an action from which "legal consequences will flow." *Id.*

158. Under the APA, the Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

159. The lease cancellation is arbitrary and capricious because Interior Defendants have not provided a reasoned explanation of the decision to cancel Lease OCS-P 0564.

160. An agency must provide a "satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. Inc. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983).

161. The Settlement Agreement's bare invocation of "national security issues" fails to explain what those issues are, how they apply to Lease OCS-P 0564, and why they could not be mitigated or avoided, either through the permitting, approval, and consultation processes; the

national security suspensions provided for under OCSLA, 43 U.S.C. § 1341; or the national security provisions included in the lease itself, GSW Lease at C-9.

162. Nor have Interior Defendants made the "finding … of particularized harm" that Lease OCS-P 0564 requires before it may be cancelled or suspended due to "an imminent threat of serious or irreparable harm or damage." *Id.* at 3–4. Nor, indeed, have they explained why they have not made such a finding.

163. Because Interior Defendants' decision to cancel Lease OCS-P 0564 is not "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), the lease cancellation is arbitrary and capricious.

164. The lease cancellation is also arbitrary and capricious because Interior Defendants have failed to provide a justification for their many changes in position regarding Lease OCS-P 0564. An agency changing its position must "display awareness that it is changing position," show that "there are good reasons" for the reversal, and demonstrate that its new policy is "permissible under the statute. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

165. Interior Defendants have long supported and promoted Lease OCS-P 0564. BOEM conducted years of analysis, consultation, and environmental review both before and after selling the lease at auction to Golden State Wind. These actions followed from a consensus across the Obama, Biden, and Trump administrations that offshore wind energy development was a valuable and important energy strategy, and that any national security impacts from offshore wind were to be addressed collaboratively in a way that continued to advance U.S. offshore wind. BOEM never previously suggested that national security concerns could justify peremptory cancellation of an offshore wind lease, without any attempt at remedies short of cancellation. Defendants' decision to cancel Lease OCS-P 0564 represents a stark departure from these prior positions.

166. An agency changing course must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks omitted). Where such reliance interests are present, the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox*, 556 U.S. at 515. The

agency is required to "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *Id.* at 33.

167. In deciding to cancel Lease OCS-P 0564, Interior Defendants have failed to consider or weigh California's financial, environmental, and sovereign reliance interests.

168. To the extent that BOEM's new policy toward Lease OCS-P 0564 rests on findings regarding national security, these findings "contradict those which underlay its prior policy." *Fox*, 556 U.S. at 515. Such factual reversals also require "a more detailed justification than what would suffice for a new policy created on a blank slate," yet Interior Defendants have provided no justification at all. *Id.*

169. The lease cancellation is further arbitrary and capricious because Interior Defendants have failed to consider any alternative means of pursuing their objectives. "An agency is required to consider responsible alternatives to its chosen policy." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008); *see also State Farm*, 463 U.S. at 48 (agency must "address[]" and give "adequate reasons" for abandoning "alternative way[s] of achieving [its] objectives").

170. Interior Defendants have failed to consider the many obvious, reasonable, and lawful routes to address national security concerns. Both OCSLA and Lease OCS-P 0564 provide that operations may be suspended for national security purposes when necessary, and the permitting and consultation process offers many additional opportunities to mitigate or avoid national security issues. Whatever their national security concerns are, Interior Defendants show no indication that they considered these possibilities.

171. Finally, the lease cancellation is arbitrary and capricious because Interior Defendants have not offered a genuine justification for the decision to cancel Lease OCS-P 0564, but a pretextual one. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (agency must "offer genuine justifications for important decisions" rather than "contrived reasons").

172. President Trump and his cabinet have acted to hinder wind energy development since January 2025, claiming at different times to be motivated by, among other things, marine

life impacts, impacts on ocean currents and wind patterns, the fishing industry, cost and affordability, aesthetic tastes, and, only more recently, national security concerns.

173. Indeed, the press release announcing the buyout agreement itself referred only briefly to "unaddressed national security concerns," instead focusing on "promoting investments away from intermittent, higher-cost energy sources" and "lower[ing] everyday energy costs."[34]

174. The Settlement Agreement provides that BOEM "would have issued . . . an order to suspend construction and operations of this project indefinitely due to national security issues, similar to the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." Settlement Agreement at 2. Those five orders were also issued on national security grounds, and each was preliminarily enjoined by courts finding that the federal government was unlikely to prevail on the merits. *See, e.g.*, Transcript of Preliminary Injunction Hearing, *Revolution Wind, LLC v. Burgum*, 1:25-cv-02999-RCL (D.D.C. Jan. 12, 2026), at 44:7-10 ("[The government's] failure to explain or apply [its] reasoning suggests that the stated national security reason may have been pretextual.").

175. The Trump administration's shifting rationales for its opposition to offshore wind and the courts' rejection of the administration's national security justification in prior offshore wind cases raise the strong inference that purported "national security issues" are not a genuine justification for cancelling Lease OCS-P 0564.

176. Indeed, administration officials' statements indicate that they have considered offshore wind with "an unalterably closed mind." *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1467 (9th Cir. 1987). President Trump has expressed a goal "to not let any windmill be built," and Secretary Burgum has stated that there is "not a future for offshore wind." Neither official cited to national security concerns at the time they made these comments.

177. President Trump's and Secretary Burgum's statements indicate that the decision to cancel Lease OCS-P 0564 was a "prejudged political conclusion," *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1261 (D. Wyo. 2004), and that the national security rationale cited in the Settlement Agreement is merely pretextual.

[34] GSW Press Release, *supra* note 2.

178. Accordingly, the lease cancellation is arbitrary and capricious and should be held unlawful and set aside.

**COUNT II: VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT AND THE ADMINISTRATIVE PROCEDURE ACT**
**The Lease Cancellation Violates OCSLA, Is Contrary to Law, Exceeds Statutory Authority, and Fails to Observe Procedure as Required by Law (Against Interior Defendants)**

179. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

180. Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action found to be "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

181. Under OCSLA, "any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter … for any alleged violation of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the Secretary under this subchapter." 43 U.S.C. § 1349(a)(1).

182. The lease cancellation violates OCSLA and its implementing regulations. Because OCLSA delineates Interior Defendants' authority to cancel an offshore wind lease, the cancellation exceeds their statutory authority.

183. Under OCSLA, Interior Defendants may cancel a lease only after a hearing, 43 U.S.C. § 1334(a)(2)(A); only after suspending the lease for five years, *id.* § 1334(a)(2)(B); and only after consulting with the Governors of affected states, *id.* §§ 1334(h), 1337(p)(7). These provisions all protect not only the property rights of the lessee, but the States' participatory rights in the leasing decisions that affect their interests. *See* Pub. L. No. 95-372, §§ 102(5)–(6), 92 Stat. 631–32.

184. Lease OCS-P 0564 itself specifically provides that "[a]ny cancellations are subject to the limitations and protections contained in" 43 U.S.C. § 1334(a)(2)(B) and (C).

185. Interior Defendants did not provide a hearing, did not suspend Lease OCS-P 0564 for five years before cancellation, and have not consulted with California's governor despite the significant impacts on the State.

186. OCSLA also includes a statutory formula to calculate the exact amount that a lessee will receive in the event of a lease cancellation. 43 U.S.C. § 1334(a)(2)(C). Instead of following that formula, Defendants are providing Golden State Wind with compensation up to the full amount that it paid for the lease. *See* Settlement Agreement §§ 2, 6. The amount Golden State Wind paid for its lease is significantly more than it would have been awarded under the statute.

187. OCSLA further requires Interior Defendants to ensure that any activity regarding offshore wind leases is carried out in a manner that provides for twelve distinct priorities, including "protection of the environment," "prevention of waste," and "a fair return to the United States for any lease, easement, or right-of-way under this subsection." 43 U.S.C. § 1337(p)(4); *see also* 30 C.F.R. § 585.102 (requiring that activities be carried out in a manner that "reaches a rational balance" among the twelve priorities).

188. Interior Defendants have failed to "provide for," balance, or otherwise consider these priorities. 43 U.S.C. § 1337(p)(4), 30 C.F.R. § 585.102. For instance, by paying Golden State Wind far more than it was owed under 43 U.S.C. § 1334(a)(2)(C), Interior Defendants have failed to provide for "a fair return to the United States." *Id.* § 1337(p)(4). Interior Defendants have also failed to consider the impact on the environment of cancelling a renewable energy project, or the waste generated by cancelling a project that has been underway for years. *Id.*

189. OCSLA implementing regulations provide specific requirements for leaseholders who intend to relinquish their lease. 30 C.F.R. § 585.435. Golden State Wind has not fulfilled—nor have Interior Defendants required it to fulfill—the requirements under this section.

190. Because the lease cancellation violates OCSLA and its implementing regulations, it should be held unlawful and set aside. 5 U.S.C. § 706(2)(A), (C), (D); 43 U.S.C. § 1349.

191. Pursuant to 43 U.S.C. § 1349(a)(2)(A), on June 23, 2026, California provided notice to Interior Defendants of these violations of OCSLA, attached as **Exhibit C**.

**COUNT III: VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT**
**The Settlement Agreement Violates OCSLA's Compensation Formula (Against all Defendants)**

192. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

193. Under OCSLA, California may "compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency … for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter." 43 U.S.C. § 1349(a)(1).

194. Because OCSLA limits compensation to circumstances where a lease has been cancelled and provides that a lease may be cancelled only after a hearing (43 U.S.C. § 1334(a)(2)(A)), and a suspension of five years (43 U.S.C. § 1334(a)(2)(B)), the payment of compensation in any amount is premature before such hearing and suspension.

195. OCSLA and its regulations limit compensation for a cancelled lease to "such compensation as [the lessee] shows to the Secretary [of the Interior] as being equal to *the lesser* of (i) the fair value of the canceled rights as of the date of cancellation, … or (ii) the excess, if any, over the lessee's revenues … of all consideration paid … and all direct expenditures made by the lessee … in connection with exploration or development … ." 43 U.S.C. § 1334(a)(2)(C); *see also* 30 C.F.R. § 550.184.

196. Here, as applied to Golden State Wind's undeveloped lease, if its fair market value is less than the bid amount paid into the U.S. Treasury plus its direct expenditures, OCSLA caps compensation at fair market value on the date of cancellation.

197. On information and belief, the GSW Lease cancellation has not been formally effectuated.

198. The bid amount of $120 million paid in 2022 is a reasonable measure of the fair value of the GSW Lease on the date the PACW-1 auction closed; it is literally the competitively determined market price of that lease.

199. On information and belief, the GSW Lease's fair value on the date of its formal cancellation will be significantly less than $120 million, however. Offshore wind developers have

written down the value of their offshore wind leases by tens or hundreds of millions of dollars following the Trump administration's generalized attacks on offshore wind projects and by even greater amounts on specific projects following federal interference with that project. Indeed, Ocean Winds announced in February 2025 a $260 million writedown for its North American offshore wind portfolio, including the GSW Lease.

200. On information and belief, the Department of the Interior's assertion of "classified national security concerns about the development of [the GSW] lease … that would have prevented the lease issuance," Settlement Agreement at 2, would have reduced the value of the GSW Lease significantly below the value recorded before that disclosure, not to mention the bid amount, because of the high risk of delay, uncertainty, and other negative impacts signaled by such assertion.

201. Despite knowing the fair value of the GSW Lease was less than $120 million, in negotiations with Interior, Golden State Wind cited OCSLA's compensation formula to assert that it was legally entitled to receive more than $120 million under the Settlement Agreement.

202. The final, executed Settlement Agreement entitles Golden State Wind to receive as much as $120 million, Settlement Agreement, §§ 2, 6, which is more compensation than OCSLA allows for a lease cancellation.

203. Under the Settlement Agreement, if the Defendants are compelled to comply with OCSLA's limits on compensation, Section 7 of the Settlement Agreement provides for reinstatement of the GSW Lease. Compelling compliance with OCSLA's compensation limits will also deter remaining offshore wind developers from entering into similar agreements and further harming California.

204. Pursuant to 43 U.S.C. § 1349(a)(2)(A), on June 23, 2026, California provided notice to Defendants of these violations of OCSLA. *See* Exh. C.

205. Accordingly, the Court should compel compliance with OCSLA's compensation formula.

206. It is unknown whether Golden State Wind has received the payment specified in Section 6 of the Settlement Agreement as of the date of this filing. If it has not, the Court should

enjoin the Federal Defendants from submitting or causing any payment until it conducts a hearing pursuant to 43 U.S.C. § 1334(a)(2)(A) and until the lease has been suspended pursuant to 43 U.S.C. § 1334(a)(2)(B). The Court should further enjoin the Federal Defendants from submitting or causing any payment in excess of OCSLA's compensation formula.

207. Otherwise, the Court should compel Golden State Wind to return the excess compensation to the United States.

**COUNT IV: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND THE COASTAL ZONE MANAGEMENT ACT**
**The Lease Cancellation is Contrary to Law (Against Interior Defendants)**

208. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

209. Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

210. The CZMA provides that any Federal agency carrying out an activity "within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone . . . shall provide a consistency determination to the relevant State agency . . . no later than 90 days before final approval of the Federal activity." 33 U.S.C. § 1456(c).

211. The cancellation of Lease OCS-P 0-564 will affect land and water use and natural resources of the coastal zone in a variety of ways. For instance, port and transmission infrastructure that would have been built in the coastal zone to support the Golden State Wind project may no longer be built due to the cancellation, and bid credit monies supporting coastal wetland restoration and central and northern coast fishing industries will no longer be available.

212. Although the lease buyout and cancellation is a Federal agency activity affecting the coastal zone, and therefore a consistency determination is required under 33 U.S.C. § 1456(c), Interior Defendants have not produced such a determination to any California state agencies. Nor have they provided a negative determination containing a basis for a determination that the activity will not affect any coastal use or resource. *See* 15 C.F.R. § 930.35.

213. Accordingly, the lease cancellation should be held unlawful and set aside.

**COUNT V: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT**
**The Lease Cancellation is Contrary to Law (Against Interior Defendants)**

214. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

215. Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

216. NEPA requires federal agencies to prepare an environmental impact statement for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

217. Agencies are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives. *See id.* § 4336.

218. Agencies are also required to consider alternatives to taking a proposed action, see 42 U.S.C. § 4332(C)(iii), (F), (H), and to identify measures that might mitigate adverse environmental impacts and incorporate measures necessary to mitigate adverse impacts, *see Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010).

219. To determine whether a major federal action will have a significant effect on "the quality of the human environment," agencies shall, with limited exceptions, prepare an environmental assessment. *See* 42 U.S.C. § 4336(b)(2).

220. If an agency determines that the proposed action will not have any significant effect, accounting for mitigation, it can issue a finding of no significant impact. *Id*. If the environmental assessment reveals that there may be significant effects, an environmental impact statement is required. *Id*. § 4336(b)(1).

221. Either level of review requires public participation opportunities and consideration of alternatives to the proposed action. *Id*. § 4332(C)(iii), (F), (H).

222. Interior Defendants' cancellation of the GSW Lease constitutes a major federal action within the meaning of NEPA. *Id*. §§ 4332(C), 4336e(10).

223. Interior Defendants did not prepare an environmental assessment and finding of no significant impact, an environmental impact statement, or a record of decision regarding the lease cancellation, nor did they otherwise conduct any NEPA review of the lease cancellation or take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives.

224. Interior Defendants did not provide the public an opportunity to participate in a NEPA review of their decision to cancel the GSW Lease.

225. As a result of their failure to conduct the required NEPA review, Interior Defendants failed to consider the full extent of the reasonably foreseeable impacts to California of the GSW Lease cancellation, including adverse impacts to grid reliability, energy diversification, and other environmental benefits that would accrue to California if the Golden State Wind project were developed.

226. Interior Defendants also failed to consider alternatives to the lease cancellation, including any mitigation measures.

227. Accordingly, the lease cancellation should be held unlawful and set aside.

## COUNT VI: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND THE JUDGMENT FUND ACT
### The Settlement Agreement is Contrary to Law (Against Federal Defendants)

228. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

229. Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

230. The Settlement Agreement constitutes final agency action reviewable under the APA. *See* 5 U.S.C. § 704; *United States v. Carpenter*, 526 F.3d 1237, 1242 (9th Cir. 2008). An agency may not "circumvent[] federal law by entering into [a] settlement agreement." *Id.*

231. The Settlement Agreement provides that Federal Defendants will pay Golden State Wind $120,240,000 from the Judgment Fund and further provides that Golden State Wind will re-direct the use of those funds toward non-renewable energy projects.

232. The Judgment Fund is not available for executive appropriations in pursuit of Federal Defendants' policy goals. Rather, it is available to pay "compromise settlements … when … payment is not otherwise provided for." 31 U.S.C. § 1304. Payment due as compensation for a lease cancellation is explicitly "provided for" under OCSLA. 43 U.S.C. § 1334(a)(2)(C). As such, the Judgment Fund is not available to pay Golden State Wind.

233. The Judgment Fund is not available to pay Golden State Wind for the additional reason that the Settlement Agreement is not a "compromise settlement[] of [a] claim[] referred to the Attorney General for defense of imminent litigation or suits against the United States, or against its agencies or officials upon obligations or liabilities of the United States." 28 U.S.C. § 2414.

234. Golden State Wind never filed suit, never gave notice of intent to sue, never sent any demand, and never filed any administrative appeal, objection, or request for hearing concerning the GSW Lease. On information and belief, the only written communication Golden State Wind ever sent to Federal Defendants that articulated any legal claim or theory against the United States or its agencies concerning the GSW Lease was sent on February 12, 2026, *after* the Interior Defendants had made a formal offer of settlement and sent over a draft agreement.

235. Nor did Interior Defendants take or initiate any formal action to suspend or cancel the GSW Lease that could have formed the basis of a legal claim against the United States or its agencies prior to settlement.

236. Instead, the Settlement Agreement states that BOEM "would have issued to Golden State an order to suspend construction and operations of this project indefinitely due to national security issues" and that "Golden State accordingly intends to immediately commence claims against the United States in the United States Court of Federal Claims asserting claims for breach of contract and/or uncompensated takings under the Fifth Amendment of the United States Constitution." Settlement Agreement at 2.

237. A hypothetical suit that Golden State "intend[ed]" to bring in response to a hypothetical order BOEM "would have" issued to suspend its lease is not "imminent litigation."

238. Moreover, a developer facing an unsupported suspension order would not bring breach of contract or uncompensated takings claims, but rather claims under the APA—which have been uniformly successful. The suit that the parties are purporting to settle is not only hypothetical, but unrealistic.

239. Even assuming a genuine breach of contract or takings claim, the remedy for such a claim would be expectation damages: the difference between the value of the GSW Lease before the Trump administration's illegal actions and the value after. That is, had the claims Golden State Wind articulated been litigated successfully, Golden State Wind would have kept the GSW Lease and obtained a sum equal to its lost value. Nor would such sum have carried with it an obligation to invest an equivalent amount in fossil-fuel projects.

240. The mismatch between the remedies available for a contract or takings claim and the provisions of the Settlement Agreement further demonstrate the buyout was not a genuine settlement of actual, imminent litigation.

241. Because Golden State Wind's claim was entirely hypothetical, it was never "referred to the Attorney General." 28 U.S.C. § 2414. On information and belief, Golden State Wind and the Interior Defendants negotiated the buyout without the U.S. Department of Justice's representation in such negotiations.

242. The Settlement Agreement's requirement that Golden State Wind's affiliates invest up to $120 million in non-governmental third parties (i.e., private fossil-fuel energy projects) is not a term the U.S. Department of Justice would have negotiated had a genuine litigation claim been referred to it, because it violates the Department of Justice's own policies.

243. Accordingly, the Settlement Agreement is not in accordance with law and should be held unlawful and set aside.

/ / /

/ / /

/ / /

**COUNT VII: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND THE ANTIDEFICIENCY ACT, PURPOSE STATUTE, AND MISCELLANEOUS RECEIPTS ACT**

**The Settlement Agreement is Contrary to Law and Exceeds Statutory Authority (Against Federal Defendants)**

244. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

245. Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

246. For the reasons described above, Federal Defendants may not pay Golden State Wind from the Judgment Fund to "settle" Golden State Wind's hypothetical claims against the United States.

247. Because the Settlement Agreement directs the payment of funds from the Judgment Fund for a purpose not authorized by the Judgment Fund, the Settlement Agreement exceeds Federal Defendants' statutory authority and violates the Antideficiency Act.

248. Under the Antideficiency Act, executive officers may not "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation" or "involve [the federal] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341. In short, the executive branch may not make an expenditure for which Congress has not first made an appropriation.

249. By contracting to make an expenditure of government funds that Congress has not appropriated for that purpose, Federal Defendants have violated the Antideficiency Act.

250. Moreover, BOEM may not spend funds that were directed to renewable energy activities for other purposes, including directing investment in oil, gas, and other non-renewable energy sources, and certainly not for activities having nothing to do with the outer continental shelf. *See* 43 U.S.C. §§ 1331(a), 1334.

251. Yet the Settlement Agreement negotiated by the Interior Department and BOEM explicitly provides for Golden State Wind to arrange for reinvestment of federal monies in "oil &

gas," "liquefied natural gas," and other "non-renewable based electricity." Settlement Agreement at 3. Many of these eligible "conventional energy projects" do not or by their nature cannot take place on the outer continental shelf. Based on Interior Defendants' press release, most or all of the fossil fuel investments supported by the Golden State Wind payout will be located on land or (at best) in the coastal, non-federal waters off the Gulf Coast.

252. Under the Purpose Statute, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301. The executive may not make a certain expenditure with appropriated funds simply because Congress has not prohibited it from doing so; rather, "all uses of appropriated funds must be affirmatively approved by Congress." *Dep't of Navy*, 665 F.3d at 1348.

253. Because Congress never authorized Federal Defendants to use renewable energy funds to direct investment in non-renewable energy sources in the coastal zones of States (i.e., not on the outer continental shelf), including through the negotiation and finalization of the Settlement Agreement, Federal Defendants' use of these funds for this purpose is contrary to the Purpose Statute and exceeds their statutory authority.

254. Finally, the Miscellaneous Receipts Act prohibits Federal Defendants from issuing to offshore wind leaseholders a "dollar-for-dollar reimbursement"[35] of their lease fees. Rather, those fees became part of the general pool of federal funds under the auspices of the U.S. Treasury when they were deposited. *See* 31 U.S.C. § 3302(b). Only Congress may direct a reimbursement through an appropriation.

255. Although the Settlement Agreement provides for payment from the Judgment Fund instead of Interior or BOEM's own funds, it is structurally a reimbursement. The Federal Defendants "cannot do indirectly what [they are] barred from doing directly." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024).

256. Because Congress never authorized Federal Defendants to reimburse Golden State Wind's lease fees, Federal Defendants' use of these funds for this purpose is contrary to the Miscellaneous Receipts Act and exceeds their statutory authority.

[35] GSW Press Release, *supra* note 2.

257. Accordingly, the Settlement Agreement is not in accordance with law and in excess of statutory authority and should be held unlawful and set aside.

**COUNT VIII: VIOLATION OF THE SEPARATION OF POWERS DOCTRINE, THE SPENDING CLAUSE, AND THE APPROPRIATIONS CLAUSE**
**The Settlement Agreement is Contrary to Constitutional Authority (Against Federal Defendants)**

258. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

259. Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

260. The Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco*, 897 F.3d at 1231.

261. Specifically, the Spending Clause provides Congress authority "[t]o lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare to the United States," U.S. Const. art. I, § 8, cl. 1, while the Appropriations Clause provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

262. By directing the expenditure of $120,240,000 to Golden State Wind for fossil-fuel energy investments that Congress never authorized or intended, and to defeat the development of renewable energy resources Congress *did* intend, using funds that Congress never appropriated for fossil fuel projects, and via a program Congress funded for renewable energy activities on the outer continental shelf, the Settlement Agreement violates the Spending and Appropriations Clauses.

263. To date, Federal Defendants have entered into nearly $4 billion in offshore wind lease buyouts. By using collusive settlement agreements to turn the Judgment Fund into an uncapped discretionary spending account, directing billions of dollars toward executive priorities never approved by Congress, Federal Defendants have effectively arrogated to themselves Congress's power of the purse.

264. By invading the province of Congress and arrogating its spending authorities, the Settlement Agreement violates the constitutional separation of powers doctrine.

265. Accordingly, the Settlement Agreement is contrary to constitutional authority and should be held unlawful and set aside.

**COUNT IX: ULTRA VIRES**
**The Lease Cancellation is *Ultra Vires* (Against Interior Defendants)**

266. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

267. Plaintiff has a non-statutory right of action to challenge action taken in excess of legal authority and have it declared unlawful. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

268. Federal courts may grant injunctive relief against federal officers who are violating federal law. *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326-27 (2015); *see Murphy Co. v. Biden*, 65 F.4th 1122, 1129 (9th Cir. 2023) (defining "*ultra vires* actions" as "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority").

269. Congress has never passed a statute authorizing Interior Defendants to cancel an offshore wind lease through a settlement agreement that bypasses the permitting and consultation framework outlined in OCSLA and its regulations. None of the statutes relied upon by Interior Defendants authorize such action; rather, OCSLA prescribes specific procedures and stakeholder rights that constrain the leasing program, reflecting Congress's express concern for the rights of affected States to participate in federal proceedings around offshore energy projects.

270. Accordingly, the lease cancellation is *ultra vires* and should be held unlawful and set aside.

**COUNT X: ULTRA VIRES**
**The Settlement Agreement is *Ultra Vires* (Against Federal Defendants)**

271. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

272. Plaintiff has a non-statutory right of action to challenge action taken in excess of legal authority and have it declared unlawful.

273. Federal courts may grant injunctive relief against federal officers who are violating federal law.

274. Congress has never passed a statute authorizing Federal Defendants to reimburse an offshore wind leaseholder its lease fees or to redirect the investment of funds from wind energy in federal waters to non-renewable energy in state coastal waters or on land. None of the statutes relied upon by Federal Defendants authorize these payments, and separate statutes such as the Antideficiency Act and Purpose Statute expressly prohibit these payments.

275. Moreover, and as described above, Federal Defendants lack the inherent constitutional authority to pursue such collusive settlements. Instead, the federal appropriations power belongs to Congress, which has not delegated that power in a manner that authorized the Federal Defendants' actions. The Settlement Agreement thus exceeds constitutional limits on the Executive Branch's authority to spend.

276. Accordingly, the Settlement Agreement is *ultra vires* and should be held unlawful and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

1. Declare that the lease cancellation, and any actions to implement it, are arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A);
2. Declare that the lease cancellation, and any actions to implement it, are not in accordance with law, and are in excess of statutory right under the APA, OCSLA, the CZMA, and NEPA;
3. Declare that the Settlement Agreement, and any actions to implement it, are not in accordance with constitutional authority, are not in accordance with law, and are in excess of statutory right under the Constitution, the APA, the Antideficiency Act, the Purpose Statute, and the Miscellaneous Receipts Act;

4. Compel compliance with OCSLA by an order limiting any payment to Golden State Wind to the fair value of the GSW Lease on the date of cancellation; or, if such payment has already been made, enjoining Golden State Wind to return the excess compensation;
5. Vacate and set aside the lease cancellation and Settlement Agreement;
6. Temporarily, preliminarily, and permanently enjoin the Defendants, including their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the lease cancellation or Settlement Agreement;
7. Temporarily, preliminarily, and permanently enjoin the Federal Defendants from entering into similar settlement agreements with any other California offshore wind lessees;
8. Award Plaintiff its reasonable costs, fees, and expenses, including attorneys' fees; and
9. Grant any other such relief as this Court may deem proper.

Dated: August 28, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California

/s/ Theodore A. McCombs
MICHAEL P. CAYABAN
MYUNG J. PARK
Supervising Deputy Attorneys General
NATALIE E. COLLINS
THEODORE A MCCOMBS
JEREMY STEVENS
Deputy Attorneys General
*Attorneys for State of California*